**CENTRAL STATES, SOUTHEAST, AND SOUTHWEST AREAS PENSION FUND and Howard McDougall, trustee, Plaintiffs,**

v.

**SHERWIN–WILLIAMS COMPANY, Defendant.**

**SHERWIN–WILLIAMS COMPANY, Plaintiff,**

v.

**CENTRAL STATES, SOUTHEAST, AND SOUTHWEST AREAS PENSION FUND, Defendant.**

Nos. 94 C 6123, 94 C 6129.

United States District Court, N.D. Illinois, Eastern Division.

March 15, 1995.

Mitchell A. Orpett, Chicago, IL, for Sherwin–Williams.

James P. Condon, Bruce Perlin, Des Plaines, IL, for Central States Fund.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Central States, Southeast and Southwest Areas Pension Fund and its Trustee (collectively "Fund," treated as a singular noun [1]) seeks to modify and vacate an arbitration award (the "Award") in favor of Sherwin–Williams Company ("Sherwin–Williams") on Fund's claim against Sherwin–Williams for complete withdrawal liability under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1368, as amended by the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §§ 1381–1461.[2] For its part, in a lawsuit filed immediately after Fund's,[3] Sherwin–Williams seeks enforcement of the Award, plus a modification that would grant it the recovery of its attorney's fees and expenses associated with the arbitration. In addition, Sherwin–Williams asks to recover its attor-

ney's fees and expenses associated with these actions.[4]

Both Sherwin–Williams and Fund now move for summary judgment under Fed. R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order:

1. Sherwin–Williams' motion for enforcement of the Award is granted, while its motions to modify the Award and for recovery of its attorney's fees and expenses are denied.

2. Fund's motion is denied.

## Legal Standards

■ This Court's authority "to enforce, vacate, or modify the arbitrator's award" under MPPAA derives from Section 1401(b)(2). Findings of fact made by the arbitrator are presumed correct, rebuttable only by a clear preponderance of the evidence (Section 1401(c)).[5] But an arbitrator's conclusions of law are subject to de novo review (Central States Fund v. Bell Transit Co., 22 F.3d 706, 710 (7th Cir.1994)), and summary judgment is in order "when no genuine issues of material fact exist and when the moving party is entitled to judgment as a matter of law" (id.).[6]

■ On each current motion this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (Bank Leumi Le–Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). Because

---

1. Because Fund is a frequent litigant in the federal courts, and to avoid cumbersome repetition, citations to others of its cases in this opinion will refer to it simply as "Central States Fund" rather than spelling out its full name.

2. All ERISA and MPPAA provisions will be cited simply "Section—," referring to their Title 29 numbering rather than to ERISA's or MPPAA's internal numbering.

3. As the numbers of the two actions suggest, they were actually filed on the same day. Random assignment resulted in their original allocation to the calendars of two different judges, but the Sherwin–Williams action has since been reassigned to this Court's calendar.

4. This is not the first time the parties have been before this District Court. Three years ago this Court's colleague Honorable John Grady refused

to reach Sherwin–Williams' constitutional attack on MPPAA in an earlier action that it brought against Fund (787 F.Supp. 136 (N.D.Ill.1992)).

5. Mixed questions of law and fact are reviewed under a similar "clearly erroneous" standard (Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. Louis Zahn Drug Co., 890 F.2d 1405, 1411 (7th Cir.1989)).

6. Though the arbitrator's Sept. 12, 1994 decision ("Decision") at 11 leaves it unclear whether he granted Sherwin–Williams' motion for summary judgment or its alternative motion to dismiss, that makes no difference in the resolution of the matter.

both Sherwin–Williams and Fund have moved for summary judgment, it is necessary to adopt "a dual perspective—one that this Court has often described as Janus-like—that sometimes involves the denial of both motions" (*Camelot Care Ctrs., Inc. v. Planters Lifesavers Co.*, 836 F.Supp. 545, 545 (N.D.Ill.1993)). But because the material facts here are not in dispute, no such hazard is posed in setting out the following account of the developments leading to arbitration.

## Facts [7]

■ Sherwin–Williams is a large employer with a number of subsidiaries and branches. Fund is a multiemployer plan as defined in Section 1002(37).

In January, 1987 a Sherwin–Williams subsidiary purchased 100% of the outstanding stock of Lyons Group, Inc. from the then owners: Lyons Group, Inc. Employee Stock Ownership Plan and Trust and a number of individual shareholders. Lyons Group, Inc. was then the holding company for Lyons Transportation Lines, Inc. ("Lyons"), a less-than-truckload motor carrier. In turn Lyons was obligated to contribute to Fund on behalf of certain eligible employees.

Lyons quickly became a losing proposition for Sherwin–Williams. Having re-evaluated its entry into the less-than-truckload carrier sector, about May 31, 1990 Sherwin–Williams sold the Lyons stock to J.R.C. Acquisition Corp. ("J.R.C.") for a $1.6 million down payment plus an installment obligation of $6.25 million payable over a six-year period, secured by mortgages on Lyons' real property.

Lyons continued to make contributions to Fund until October 12, 1990. Then on October 19, 1990 both J.R.C. and Lyons filed for Chapter 11 bankruptcy. On November 30, 1990 Fund assessed Lyons' withdrawal liability at $1,764,339.15 due to what Fund's letter labeled Lyons' "permanent cessation of contributions to Fund, Southeast and Southwest Areas." Fund viewed the Lyons stock sale to J.R.C. as the proximate cause of Lyons' collapse and consequently sought to hold Sherwin–Williams accountable as a member of the commonly controlled group that had included Lyons.

On March 1, 1991 Sherwin–Williams submitted a Request for Review to Fund to contest the assessment of such liability. Sherwin–Williams first asserted that neither it nor Lyons was a member of any controlled group of trades or businesses at the time that Lyons stopped contributing to Fund, because Sherwin–Williams had already sold Lyons in a bona fide transaction. Alternatively Sherwin–Williams argued that it could not be held liable for a complete withdrawal in any event because Dupli–Color, another Sherwin–Williams entity that it had acquired in 1985, continued to contribute to Fund even after the Lyons bankruptcy. Finally, if Sherwin–Williams were to be found liable for a partial withdrawal, the company argued that such liability could not be calculated until the end of 1993 under the three-year provision of Sections 1385(b) and 1386.

It was not until it received a January 22, 1992 letter that Sherwin–Williams learned that Fund had denied its request. As required by Section 1399(c)(2), Sherwin–Williams paid a total of $1,988,989.62 to Fund pursuant to its assessment from March 1991 through January 1993. Then Sherwin–Williams exercised its option under Section 1401(a) to request arbitration of that assessment following the denial of its Request for Review.

Arbitrator Lawrence Katz was assigned to the matter under American Arbitration Association procedures. Arbitrator Katz first determined, in a January 4, 1994 letter ruling,

---

7. This District Court's General Rule ("GR") 12(m) and 12(n) respectively require the submission of factual statements in support of and in opposition to Rule 56 motions. Fund complied with those rules by filing a GR 12(m) statement, but Sherwin–Williams has neglected to file anything that even remotely resembles the required submissions. Our Court of Appeals has ruled consistently that the GR 12 requirements may be applied strictly even where the parties have not engaged in the type of willful conduct that might trigger a default judgment (*Johnson v. Gudmundsson*, 35 F.3d 1104, 1108 (7th Cir.1994)). Thus all facts claimed and adequately supported by Fund may be assumed true by this Court (*Stewart v. McGinnis*, 5 F.3d 1031, 1034 (7th Cir.1993)), though that really makes no difference in cases such as this where the parties agree on the relevant facts.

that the issue of Sherwin–Williams' *partial* withdrawal was not properly before him and that what he had to decide was whether Sherwin Williams had *completely* withdrawn from Fund. In his later Decision the arbitrator held that Sherwin–Williams could not be held liable for a complete withdrawal where other members of the Sherwin–Williams controlled group continued to contribute to Fund. Accordingly Sherwin–Williams was awarded the balance of its contributions under the Lyons assessment plus interest.

### Arbitrator's Decision

To facilitate a meaningful review of the Award, this opinion sets out the Decision in some detail. To begin with, the arbitrator construed the disputed facts in favor of Fund. Because in his view Sherwin–Williams' other claims depended in large part on disputed facts (Decision at 4), the single issue before the arbitrator was whether the combination of (1) the stock sale, (2) Lyons' later cessation of operations and (3) Lyons' failure to contribute to Fund after filing bankruptcy gave rise to a *complete* withdrawal for which Sherwin–Williams would be liable (Decision at 5).

But even on the assumption that Sherwin–Williams was legally responsible for Lyons' deficiencies under one or both of the theories presented by Fund, the arbitrator held that the sale of Lyons' stock should then be disregarded so that the pre-sale Sherwin–Williams controlled group (including Lyons) remained intact.[8] That would render Sherwin–Williams still financially responsible for whatever withdrawal liability was created by Lyons' failure to contribute to the fund (Decision at 6–7). Arbitrator Katz noted that this is exactly what occurred in another arbitration in New York that had dealt with the same sequence of events involving Sherwin–Williams and Lyons but that had addressed the relationship between Sherwin–Williams and a different pension fund (*id.*).

But distinguishing the New York arbitration (in which the failure of Lyons to contrib-

ute to the fund there had been held to trigger a complete withdrawal), the arbitrator pointed out that Lyons was only one of several entities in the Sherwin–Williams controlled group that had been contributing to Fund. By contrast Dupli–Color, another of the Sherwin–Williams controlled group subsidiaries, continued to contribute to Fund throughout, even after the Lyons bankruptcy. Thus Lyons' cessation of contributions would leave Sherwin–Williams responsible only for a partial withdrawal because at least one other entity in the group continued making payments (Decision at 7). There could be no complete withdrawal, even assuming that Sherwin–Williams remained responsible for Lyons after the stock sale.

Fund sought to avoid that analysis and to establish a complete withdrawal by advancing a bifurcated approach. On the one hand, Fund argued that the instant preceding the stock sale should be the controlling moment for ascertaining the identity of the "employer" in order to decide whether Sherwin–Williams was still responsible for Lyons' later failure to contribute to the fund. On the other hand, Fund contended that the stock sale should be taken into account for the purpose of splitting up the Sherwin–Williams controlled group into (1) a new Sherwin–Williams controlled group (without Lyons) and (2) a new J.R.C./Lyons entity. That then would cause Lyons' cessation of contributions to result in a complete withdrawal, because Lyons would have been the sole contributor to Fund in the new "stand-alone" entity (Decision at 8).

Arbitrator Katz rejected Fund's approach, viewing its argument as both illogical and unsupported by authority (*id.*):

> There are fundamental problems with the Fund's argument. Its asymmetrical approach to the stock sale is neither logical, nor supported by any cited arbitral or judicial precedents. The Fund seeks to pick and choose the consequences which arise from the statutory disqualification of the stock sale. In effect, the Fund wishes the arbitrator to recognize the conse-

---

**8.** As this opinion later reflects, Fund is correct in characterizing that ruling as an impermissible misreading (or misapplication) of the statute.

quences which work to its advantage (the continuing financial liability of S–W), while disregarding those which work to its disadvantage (the continuation of the pre-sale S–W controlled group).

Because at least one other entity in the Sherwin–Williams controlled group was making contributions to Fund both when the stock sale occurred and afterwards,[9] the arbitrator found that Sherwin–Williams could have been liable only for a partial withdrawal if no sale had occurred and if Lyons had then failed (*id.*). In no event, the arbitrator reasoned, should this case be treated differently simply because there was a non-qualifying stock sale.

### MPPAA in General

As first enacted in 1974, ERISA created the Pension Benefit Guarantee Corporation ("PBGC") to administer and enforce a pension plan termination insurance program under which employers were required to pay insurance premiums (*Concrete Pipe & Prods. of California, Inc. v. Construction Laborers Pension Trust for S. Cal.*, — U.S. —, —, 113 S.Ct. 2264, 2272, 124 L.Ed.2d 539 (1993)). But under those original terms, the guaranty of basic benefits by multiemployer plans in the event of termination was not mandated to take effect until 1978 (*id.*). As the date for mandatory coverage approached, Congress recognized that employers might withdraw from weak plans to escape liability (*id.*). Fearing that the insurance system as originally conceived might be jeopardized by such an exodus, Congress postponed the mandatory guaranty date and requested that PBGC analyze the potential threat to multiemployer plans and suggest solutions (*id.*).

■ In 1980 Congress enacted MPPAA in response to the advice that it had received from the PBGC (*id.*). Its purpose was to hold employers accountable for their vested pension fund liabilities upon their withdrawal from multi-employer plans (*Bell Transit*, 22 F.3d at 707). As the Secretary of Labor testified before Congress (*Multiemployer*

*Pension Plan Amendments Act of 1980: Hearings on H.R. 3904 Before Subcomm. on Labor–Management Relations of the House Comm. on Education & Labor*, 96th Cong., 1st Sess. 362 (1979)):

> [A]n employer that leaves the multiemployer pension plan would be required to pay its fair share of the plan's vested liabilities. The objective of this element is to discourage withdrawals and to provide a financial cushion for the plan which is not now provided by the present system because of the limitations of liability and the absence of any disincentive to withdraw.

■ Hence an employer that withdraws from a multiemployer pension plan is now held responsible for "a sum approximating the vested but unfunded benefits of the employer's employees" (*Santa Fe Pac. Corp. v. Central States Fund*, 22 F.3d 725, 726 (7th Cir.1994), citing 29 U.S.C. §§ 1381 et seq.). Technically MPPAA charges the employer with the difference between the present value of vested benefits and the current value of the plan's assets (*Concrete Pipe*, — U.S. at —, 113 S.Ct. at 2272). That "withdrawal liability" not only protects other employers in the plan from having to pay for those benefits (*Santa Fe*, 22 F.3d at 727) but also operates to avoid the ultimate shifting of such costs to PBGC as the insurer under the plan (*Bell Transit*, 22 F.3d at 707).

■ To collect withdrawal liability, a plan first calculates the amount owed by a withdrawing employer (Sections 1382 and 1391) and then notifies the employer of the amount due (Section 1399(b)(1)). Any employer that wishes to challenge the assessment of liability may submit a request to the plan for review (Section 1399(b)(2)) and may initiate arbitration if dissatisfied with the results (Section 1401(a)(1)). Throughout the proceedings, however, the plan's determination of liability is presumed correct unless the party contesting the determination can establish by a preponderance of the evidence that the determination is unreasonable or clearly erroneous (Section 1401(a)(3)(A)).[10]

---

9. There was a dispute over the status of one other Sherwin–Williams subsidiary, but the statement in the text was concededly accurate as to Dupli–Color.

10. In the interim neither the request for review nor the demand for arbitration tolls the employer's duty to pay on the assessment (*Bell Transit*, 22 F.3d at 707).

■ Not all employers who withdraw from a plan must pay withdrawal liability (*Bell Transit*, 22 F.3d at 707). *Connolly v. PBGC*, 475 U.S. 211, 225–26, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986) teaches:

> The assessment of withdrawal liability is not made in a vacuum, however, but directly depends on the relationship between the employer and the plan to which it had made contributions. Moreover, there are a significant number of provisions in the Act that moderate and mitigate the economic impact of an individual employer's liability.

Thus, for example, Section 1398 provides that a mere change in corporate structure does not of itself trigger employer withdrawal liability. But it is also true that *no* transaction will be favored with an exemption where a principal purpose is the evasion or avoidance of withdrawal liability (Section 1392(c)).

Given the limited scope of the current issues, however, this opinion will join the arbitrator in his view that neither of those two sections is directly applicable to the transactions at issue (though this Court cautions that it does not share the arbitrator's reading of those sections). With that background, this opinion cuts to the chase.

### *Liability for Complete Withdrawal*

■ When issues of statutory interpretation are brought before a court, the appropriate place to begin is of course with the statutory language (*Bell Transit*, 22 F.3d at 710).[11] In that respect *Central States Fund v. Cullum Cos.*, 973 F.2d 1333, 1339 (7th Cir.1992) repeats the message of *Central States Fund v. Bellmont Trucking Co.*, 788 F.2d 428, 433 (7th Cir.1986):

> When Congress enacted the MPPAA, it "did not merely select a broad policy goal and instruct the courts to achieve that

objective. Rather, Congress itself decided what rules, and exceptions to those rules, would best achieve its goals."

And to that end the words of the statute should normally be given their common meanings (*Smith v. United States*, —— U.S. ——, ——, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993)).

First among the relevant statutory provisions, Section 1383(a) sets out the instances in which a complete withdrawal occurs:

> For purposes of this part,[12] a complete withdrawal from a multiemployer plan occurs when an employer—
>
> (1) permanently ceases to have an obligation to contribute under the plan, or
>
> (2) permanently ceases all covered operations under the plan.

"Employer" is in turn defined in Section 1301(b)(1):

> For purposes of this subchapter,[13] under regulations prescribed by the corporation [PBGC], all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer.

■ Read together, those provisions make it clear "that trades and businesses under common control are to be treated as a single entity and are jointly and severally liable for each other's withdrawal liabilities" (Ronald Cooke, *ERISA Practice & Procedure* § 7.47, at 7–142 (1994) and cases cited there). To determine whether a complete withdrawal has occurred, "contributions of the entire commonly controlled group must be taken into account by the plan sponsor" (PBGC Op. 82–13, 1982 WL 21113, 1982 PBGC LEXIS 28, at *3 (Apr. 12); see also

---

11. *Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.*, 872 F.2d 208, 212–13 (7th Cir.1989) thus looked to the plain language of the statute without regard to legislative history in deciding whether Section 1383(a)(2)'s determination that a complete withdrawal occurs when an employer "permanently ceases all covered operations under the plan" should be satisfied when the employer ceased "virtually all" covered operations.

12. [Footnote by this Court] "This part" refers to the "Employer Withdrawals" portion of Subtitle E of the "Plan Termination Insurance" subchapter of Title 29—more specifically "this part" comprises Sections 1381 through 1405.

13. [Footnote by this Court] "This subchapter" refers to the entire "Plan Termination Insurance" subchapter of Title 29: Sections 1301 through 1461.

PBGC Op. 92–1, 1992 WL 425182, 1992 PBGC LEXIS 1, at *4–*5 (Mar. 30)).[14]

■ Of course corporations in a parent-subsidiary relationship present the paradigmatic example of trades or businesses under common control. So if a subsidiary withdraws from a plan, its withdrawal liability (if any) can plainly be assessed against its parent (*Santa Fe*, 22 F.3d at 727).

Even though the two already-quoted provisions (Sections 1383(a) and 1301(b)(1)) speak to the concepts of "complete withdrawal" and "employer," they do not necessarily answer the question posed here: whether the complete withdrawal of an "employer" (in this instance Lyons and any commonly controlled post-stock-sale entities) can impose MPPAA liability on any of the other companies that were part of the pre-stock sale "employer" (in this instance Sherwin–Williams). On that subject both litigants (and the arbitrator) have sought to draw inferences from Sections 1392(c) and 1398:

§ 1392(c):

If a principal purpose of any transaction is to evade or avoid liability under this part,[15] this part shall be applied (and liability shall be determined and collected) without regard to such transaction.

§ 1398:

Notwithstanding any other provision of this part,[16] an employer shall not be considered to have withdrawn from a plan solely because—

1. an employer ceases to exist by reason of—

(A) a change in corporate structure described in section 1362(d) of this title, or

(B) a change to an unincorporated form of business enterprise, if the change causes no interruption in employer contributions or obligations to contribute under the plan, or

2. an employer suspends contributions under the plan during a labor dispute involving its employees.

For purposes of this part, a successor or parent corporation or other entity resulting from any such change shall be considered the original employer.

Arbitrator Katz resolved the question identified in the preceding paragraph of the text by stating that if Fund's assertion about Sherwin–Williams having caused the drying up of Lyons' contributions by having sold Lyons' stock is to be accepted, the sale of stock should be disregarded for all purposes relating to withdrawal liability. With all respect, that is just wrong. Congress well knew how to mandate such a result when it wanted to—Section 1392(c) shows that. But Section 1398 contains no such rule, and this Court cannot insert one where Congress has not.

Next, according to the arbitrator (Decision at 5):

In the instant case, S–W's basic position is that its May 31, 1990 sale of Lyons' stock was qualifying under § 1398, and not subject to disqualification under § 1392.

It is difficult to tell from Sherwin–Williams' filings before this Court whether that accurately characterizes its position—but if it does, that too is wrong. Section 1398 just does not describe the transactions that have given rise to this litigation.

■ What controls here, however, is that in terms of the controlling statutory provisions it is *Fund* that is wrong. There is no

---

14. Absent compelling indications that the interpretation of a statute by the agency charged with its execution is wrong, courts may view such interpretations as definitive guides (over a quarter century ago *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969) characterized that as an already "venerable principle"). PBGC opinions are normally accorded the same deference that is shown to the decisions of other federal regulatory agencies (see *Robbins v. Pepsi–Cola Metropolitan Bottling Co.*, 636 F.Supp. 641, 654 n. 23 (N.D.Ill.1986)). And that should apply with particular force where PBGC (which might be deemed an interested party) has issued decisions that cut *against* finding liability for complete withdrawal.

15. [Footnote by this Court] As n. 12 indicates, "this part" comprises Sections 1381 through 1405.

16. [Footnote by this Court] *Ibid.*

complete withdrawal under Section 1383(a) unless the statutory "employer" permanently ceases to have any contribution obligation or permanently ceases all covered operations under the relevant plan. And because that did not occur as to the entire Sherwin–Williams conglomeration that constituted the statutory "employer" under Section 1301(b)(1), and because Dupli–Color has always been part of that conglomeration and a contributor to Fund, no statutory "complete withdrawal" can be found here.

2 *Labor & Employment Arbitration* § 40.04[10], at 40–95 to 40–96 (Tim Bornstein & Ann Gosline eds., 1994) puts the statutory mandate simply:

> [A]ll commonly controlled entities must be taken into account in determining whether there has been a withdrawal. For example, there can be no complete withdrawal from a fund as long as any member of a commonly controlled group remains a contributing employer to that fund.

*Penn Cent. Corp. v. Western Conference of Teamsters Pension Trust Fund,* 863 F.Supp. 1131, 1134 (N.D.Cal.1994) (emphasis added) makes the same point in an analogous context:

> Here, it is undisputed that G.K Trucking, Marathon Steel, and Buckeye Gas were under the common control of Penn Central until the sale by Penn Central of Buckeye Gas to the Ferrell Group. Prior to that sale, the cessation of operations under the Plan by G.K. Trucking and Marathon Steel generated a withdrawal liability of $60,618 to the Plan. This sum was G.K. Trucking and Marathon Steel's proportional share of the Fund's vested benefit shortfall attributable to their employees and operations. *Complete withdrawal liability was not assessable, however, at the time these two subsidiary corporations permanently ceased operations under the Plan because Penn Central, their parent and the "employer" under ERISA § 4001(b)(1), continued to contribute to the Fund on behalf of Buckeye Gas.*

See also *Western Dominion Coal Co. & UMW 1950 & 1974 Pension Plans,* 6 Employee Benefits Cas. (BNA) 2353, 2369 (1985) (Gordon, Arb.).

Indeed, Fund's R.Mem. 14 n. 7 (emphasis added) openly concedes that it urged a position contrary to its present one before one of this Court's colleagues in an unrelated case only two years ago:

> Sherwin–Williams is correct in noting that in *Santa Fe Pacific v. Central States,* 1992 WL 281350, 1992 U.S.Dist. Lexis 15159 (N.D.Ill.1992), *reversed,* 22 F.3d 725 (7th Cir.1994), the Pension Fund asserted that a non-qualifying stock sale resulted in a partial withdrawal (S–W 12/21/94 Memo, p. 17).[17]

While Fund is not legally precluded from arguing a different position in the matter before this Court, its current vigorous opposition to Arbitrator Katz's conclusion might perhaps be considered a bit suspect.

But what has been said to this point should not be misunderstood. Any syllogistic approach that is based solely on the two statutory provisions defining "complete withdrawal" and "employer" is somewhat simplistic in relation to the specific situation before this Court, a situation that so far as this Court is aware presents a question of first impression. It cannot be gainsaid that MPPAA does *not* speak in direct terms to the scenario that has been alleged by Fund—a scenario that must be credited as true on the present motions. And on its side Sherwin–Williams has done little more than to iterate and reiterate several wholly unpersuasive contentions, apparently in the hope that such repetition will take the place of careful analysis.

■ This Court has wrestled conceptually with what is to be treated as a given for current purposes: Fund's allegation that Sherwin–Williams' sale of Lyons' stock *caused* the ensuing collapse of Lyons as a Fund contributor. For purposes of analysis that allegation collapses the time interval between the stock sale and the cessation of contributions, so that in legal contemplation the situation is just as though Sherwin–

---

17. [Footnote by this Court] Fund's sole attempt to distinguish *Santa Fe* is to argue that the technical assessment of partial as opposed to complete withdrawal in that case made little difference because the recovery sought under either theory would have been roughly the same.

Williams sold the Lyons stock and Lyons' Fund contributions ceased immediately. There is no question that Lyons' cessation of contributions resulted in a complete withdrawal from Fund by *Lyons* and its commonly-controlled group (the group created by the sale of stock to J.R.C.). And although Fund has not put the legal issue in these terms, the question then really becomes whether a parent company whose conduct has directly caused its subsidiary to trigger multi-million dollar MPPAA liability may itself be held liable for its own conduct in having done so.

So put, the question is not so simple. It demands an inquiry that stretches beyond the two statutory provisions that have been discussed at length here. What has clinched a negative answer to the question for this Court is that such an attempt to impose liability on Sherwin–Williams would really be *non*-statutory in nature, calling for the judicial recognition of an implied private cause of action where Congress has not expressly created one. And on that score the Supreme Court's increasing reluctance to recognize such implied rights of action should control here. In light of the intricate statutory structure of MPPAA, what was said in *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146–47, 105 S.Ct. 3085, 3092–93, 87 L.Ed.2d 96 (1985) (citations omitted) about ERISA seems equally applicable to this case by parity of reasoning:

> The six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted, however, provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly. The assumption of inadvertent omission is rendered especially suspect upon close consideration of ERISA's interlocking, interrelated, and interdependent remedial scheme, which is in turn part of a "comprehensive and reticulated statute."
>
> \* \* \* \* \* \*
>
> We are reluctant to tamper with an enforcement scheme crafted with such evident care as the one in ERISA. As we stated in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 [100 S.Ct. 242, 247, 62 L.Ed.2d 146] (1979):

> > "[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." "The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement."

Accord, *Mertens v. Hewitt Associates*, —— U.S. ——, ——, 113 S.Ct. 2063, 2067, 124 L.Ed.2d 161 (1993), citing and quoting *Massachusetts Mut.* in part; and accord in the MPPAA context, *Bellmont Trucking*, 788 F.2d at 433; *Teamsters Pension Trust Fund v. Central Mich. Trucking, Inc.*, 857 F.2d 1107, 1111 (6th Cir.1988).

In summary, Fund's assertion of Sherwin–Williams' complete withdrawal liability does not carry the day. Each side has recognized the potential for Sherwin–Williams' liability for *partial* withdrawal, but that liability is not yet ripe. Hence Sherwin–Williams prevails in the narrow scope of the current lawsuits.

### Attorney's Fees

Sherwin–Williams asks this Court to shift to Fund the burden of Sherwin–Williams' attorney's fees and expenses both for the arbitration and for these actions. Because those claims involve differing standards of review, they will be dealt with separately.

### Fees for the Arbitration

Arbitrator Katz was empowered to award reasonable attorney's fees to either party at the conclusion of the arbitration proceeding (Section 1401(a)(2)). For that purpose the relevant standard is set out in 29 C.F.R. § 2641.9(c):

> *Attorney's Fees.* The arbitrator may require a party that initiates or contests an arbitration in bad faith or engages in dilatory, harassing, or other improper conduct during the course of the arbitration to pay reasonable attorney's fees of other parties.

Here is what Arbitrator Katz said in refusing to shift fees (Decision at 12):

> Unlike the proceeding involving this Employer and the New York State Teamsters

Fund, this proceeding has involved complex questions of multiple contributing entities within the S–W controlled group, and possible multiple triggers or events of withdrawal. In this context, questions as to whether and when withdrawals occurred, the nature of the withdrawals (complete or partial) and S–W's financial responsibility for any resulting liability, are hardly clear-cut.

\*　\*　\*　\*　\*　\*

I find no basis for allocating attorney's fees and costs or the arbitrator's fees against the Fund. Each party shall be responsible for its own attorney's fees and costs and for half of the arbitrator's fee.

 That plainly reflects the arbitrator's judgment that both parties had offered up good faith arguments for their competing approaches to determining withdrawal liability under MPPAA. Though clearly aware of Fund's earlier espousal of a different view in *Santa Fe* (Decision at 10), the arbitrator refused to find misconduct on Fund's part for advancing a novel position in the instant case. This Court will not overturn that decision.

*Fees Before This Court*

Section 1451(e) authorizes an award of reasonable attorney's fees and expenses to the prevailing party unless the losing party's position was "substantially justified" (*Construction Indus. Retirement Fund of Rockford v. Kasper Trucking, Inc.*, 10 F.3d 465, 469 (7th Cir.1993)). *Bittner v. Sadoff & Rudoy Indus.*, 728 F.2d 820, 830 (7th Cir.1984) first established that standard:[18]

[W]e turn for a useful analogy to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), which entitles a prevailing party in many types of suit against the government to a reasonable attorney's fee "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." These words create a modest presumption (modest because of the "special circumstances" exception) in favor of awarding reasonable attorney's fees to the winning party, plaintiff or de-

fendant, unless the loser's position, while rejected by the court, had a solid basis—more than merely not frivolous, but less than meritorious.

 It should be plain from all that has gone before that in these cases the parties have essentially been asking this Court to write on a clean slate. Neither has been able to adduce authority on the special circumstances posed in this case: not just the cessation of contributions by a subsidiary, but such a cessation caused directly by its parent's action in selling the subsidiary's stock so as to disable the subsidiary financially. What the arbitrator said in Decision at 12 (quoted earlier in this opinion) about the complexity and non-clear-cut nature of the questions dealt with here applies with at least equal force at this stage of the parties' dispute.

*Conclusion*

Fund's motion to vacate or modify the Award is denied, while Sherwin–Williams' motion to enforce the Award is granted. Sherwin–Williams' additional motions (1) to modify the Award and (2) to obtain an award of attorney's fees and expenses relating to these actions are denied. Both these actions have now been dealt with in their entirety.

---

18. While *Bittner* dealt with Section 1132(g)(1) (applicable to conventional ERISA enforcement actions), *Continental Can Co. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (In-*

*dependent) Pension Fund*, 921 F.2d 126, 127 (7th Cir.1990) has confirmed the application of the same principle to actions brought under Section 1451(e).