106 T.C. No. 17

UNITED STATES TAX COURT

CITY OF COLUMBUS, OHIO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3301-95B.                          Filed May 14, 1996.

P, a home rule municipal corporation and political
subdivision of the State of Ohio, seeks a declaratory
judgment that interest on bonds it proposes to issue
will be exempt from taxation under sec. 103(a), I.R.C.
In 1967, in exchange for the assumption of P's accrued
unfunded pension obligation by a fund established for
that purpose by the State of Ohio, P incurred a long-
term obligation to the State Fund.  In 1994, P made a
lump-sum payment equal to 65 percent of the remaining
principal in satisfaction of the long-term obligation.
Taking into account the 35-percent discount, the yield
to P in making the prepayment, as compared to the
payments it otherwise would have made, is 7.57484
percent.  P proposes to issue long-term obligations,
with an interest rate of 6 percent, to fund the
prepayment to the State Fund.  Pending our decision
herein, P has issued short-term obligations to fund the
prepayment.  <u>Held</u>, P entered into the prepayment
transaction with a principal purpose being to profit

from the discount offered by the State Fund.  <u>Held</u>, <u>further</u>, to reflect the economic substance of the transaction, R may characterize the prepayment as the acquisition of property.  Sec. 1.148-10(e), Income Tax Regs.  <u>Held</u>, <u>further</u>, the prepayment constitutes investment-type property, sec. 148(b)(2), I.R.C., with a materially higher yield than the proposed bonds. Thus, interest on the proposed bonds will not be excludable from gross income under sec. 103(a), I.R.C.

<u>David L. Miller</u>, <u>Jerry O. Allen</u>, and <u>David A. Rogers</u>, for petitioner.

<u>Rebecca L. Caldwell-Harrigal</u>, <u>Joel E. Helke</u>, and <u>Richard L. Carlisle</u>, for respondent.


OPINION


TANNENWALD, <u>Judge</u>:  This is an action for a declaratory judgment pursuant to section 7478 and Rule 211.[1]  On June 3, 1994, petitioner submitted a ruling request to respondent seeking a determination that interest on certain proposed bonds will be excludable from gross income under section 103(a).  After administrative review, on December 5, 1994, respondent ruled that interest on the proposed bonds will not be excludable under section 103(a) on the grounds that the bonds would be arbitrage and/or hedge bonds within the meaning of sections 148 and 149(g), respectively.  All of the jurisdictional requirements for a declaratory judgment action have been satisfied.  Rule 210(c).

_____

[1] All statutory references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioner bears the burden of proof. Rule 217(c)(2)(A). Our decision is based upon the stipulated administrative record, which is incorporated herein by this reference, and additional evidence received pursuant to an Order of this Court. Rule 217(a).[2]

Petitioner is the City of Columbus, Ohio (City). On December 20, 1993, the City Council of Columbus adopted an ordinance authorizing the issuance of bonds in a principal amount not to exceed $28 million. In its ruling request, petitioner anticipated the actual amount of the proposed bonds would be $27,300,000. Having retired $600,000 in principal amount of its 1994 bond anticipation notes (see infra p. 8), petitioner now anticipates the actual amount of the proposed bonds will be $26,700,000.

Petitioner is a home rule municipal corporation and political subdivision of the State of Ohio (State). Before 1967, the City maintained two pension funds for its police officers and firefighters (collectively referred to hereinafter as the City Fund).

In 1965, a State law was enacted creating the Police and Firemen's Disability and Pension Fund (the State Fund), a

---

Respondent objects to what she describes as petitioner's attempt to admit additional material into evidence, by way of Appendices A and B to petitioner's opening brief. Appendix A contains an amortization of the City Obligation based on an exhibit in the stipulated record and is thus not new evidence. Appendix B, however, is an amortization schedule of the proposed bonds and is new evidence as to which we sustain respondent's objection.

statewide pension fund for police officers and firefighters.  The State Fund was created to replace unfunded plans of the City and other municipalities with a fully funded pension plan.  The State Fund assumed and guaranteed the pre-1967 pension liabilities of Ohio municipalities, including the City (the State Fund Obligation).  In addition, the State law provided that pension liabilities for police officers and firefighters accruing on and after January 1, 1967, would be supported by current employer and employee contributions.

Pursuant to the State law, the value of the transferred liabilities and assets of each municipality was determined by The Wyatt Company (Wyatt), an actuarial company employed by the State to make the calculations.  Wyatt computed the present value of each municipality's accrued unfunded pension liability, using a discount factor of 4.25 percent, compounded annually (the mathematical equivalent of 4.21 percent compounded semiannually), and certain actuarial assumptions based on mortality tables.  Wyatt determined the present value of the accrued unfunded liabilities of the City Fund that were transferred to the State Fund, to be $44,638,971.  Of that amount, $1,929,702 was satisfied by assets of the City Fund, and the City was credited with $21,470 of accrued interest, resulting in a net accrued liability of $42,687,799.

On January 1, 1967, as required by the law creating the State Fund, the liabilities and assets of the City Fund were transferred to the State Fund.

The State law required each municipality to pay to the State Fund, either immediately or over time with interest, an amount equal to its accrued unfunded pension liability, i.e., the difference between the transferred liabilities and assets. If a municipality opted to pay that amount over time, the State law, as originally enacted, required it to pay interest at 4 percent per annum on the unpaid balance. Subsequent to an amendment to the State law in 1968, the interest rate charged by the State Fund has been 4.25 percent per annum.

Petitioner chose to pay the present value of its accrued unfunded pension liability over time (the City Obligation). It has never been obligated to make up for any shortfalls or deviations from the actuarial calculation of its accrued unfunded pension liability.

The deferred payment option in the original State law required any amount unpaid as of January 1, 1968, to be paid over 20 years in equal principal installments, i.e., at least 5 percent of the amount unpaid as of January 1, 1968, each year), together with interest at 4 percent. Principal and interest on the obligation were payable semiannually on dates to be determined by the trustees of the State Fund. By State law,

effective November 25, 1969, the unpaid City Obligation, as of January 1, 1969, was to be paid 2 percent in 1969, 2 percent in 1970, 3 percent in 1971, 4 percent in 1972, and 5 percent per annum beginning in 1973 and each year thereafter for 62 years. This repayment schedule incorporated the payment of interest at a rate of 4.25 percent, compounded semiannually. The City made payments pursuant to the above schedule through 1993.

Under the State Fund pension system, both municipal corporations and their employees who are police officers and firefighters contribute a percentage of current wages to the State Fund. The State Fund pays pensions in defined amounts to retired police officers, firefighters, and surviving spouses and dependents. It treats all participating municipal corporations and their police officers and firefighters equally based on current contributions. No consideration is given as to whether a particular municipal corporation paid the principal amount of its accrued unfunded pension liability in full or agreed to pay such liability over time. Amounts in the State Fund are invested for the equal benefit of all police officers and firefighters throughout the State. The actuary for the State Fund has assumed a rate of return on investments of the State Fund of 8.25 percent, compounded annually.

Approximately 304 municipalities transferred their assets and accrued liabilities as of January 1, 1967, to the State Fund.

In 1993, section 742.30(C) was added to the Ohio Revised Code which provided:

> (C) The board of trustees of the police and firemen's disability and pension fund may enter into an agreement with a municipal corporation for a single payment by the municipal corporation of the employer's accrued liability. The agreement may provide for a reduction in the amount of the accrued liability based on the value to the fund of receiving a single payment. A municipal corporation that has made payment in accordance with such an agreement shall have no further obligation to make payments under this section. [Ohio Rev. Code Ann. sec. 742.30(C) (Anderson Supp. 1995).]

Pursuant to this provision, the State Fund allowed single, lump-sum payments, beginning October 20, 1993. The State Fund adopted 65 percent of the outstanding principal balance as the discounted amount it would accept for such a payment.

From October 20, 1993, to December 14, 1995, 36 municipalities, including the City, made a lump-sum payment, in exchange for release of the full amount of their outstanding liability to the State Fund.

On November 3, 1993, the City entered into a prepayment agreement with the State Fund. On November 15, 1993, the outstanding principal balance of the City Obligation was $41,435,720, which amount was still to be paid periodically until 2035. Under the agreement, the City agreed to pay a lump sum of $26,933,218, following which it would have no further obligation to the State Fund. The City was obligated to make the lump-sum

payment within 90 days of November 3, 1993, and was required to pay interest at a rate of 4.25 percent per annum from November 15, 1993, until the payment was made. The City made the payment of $27,304,720 to the State Fund on January 31, 1994, including interest of $371,502.

If the 35-percent discount is taken into account, the yield to petitioner for prepaying the City Obligation, as compared to the payments it otherwise would have made, is 7.57484 percent.

It was commercially reasonable for the City to finance the lump-sum payment by issuing obligations carrying a taxable interest rate. However, petitioner initially contemplated issuing tax-exempt bonds. After discussions with respondent, and before issuing long-term bonds, petitioner decided to obtain a private letter ruling from respondent on whether interest on the bonds would be excludable from gross income under section 103.

On January 31, 1994, the City issued $27,300,000 in 1-year bond anticipation notes (BAN's), due January 31, 1995. The BAN's sold for $27,334,125 and were general obligations of the City. On January 31, 1994, the City transferred $27,304,720 of the BAN proceeds to the State Fund in satisfaction of the lump-sum payment agreement.

Upon the maturity of the 1994 BAN's, petitioner, having repaid $600,000 of the 1994 BAN's, refinanced the remaining $26,700,000 with an issue of BAN's in that amount, maturing

January 30, 1996 (the 1995 BAN's).  All 1995 BAN proceeds were expended on January 31, 1995, to discharge the 1994 BAN's.

Petitioner intends to continue to refinance the 1995 BAN's with short-term BAN's until there is a final court determination in this matter.[3]

Petitioner proposes to issue the proposed bonds either on a tax-exempt or taxable basis, depending on the final determination in this proceeding, and immediately utilize all proceeds of the bonds to discharge the then-outstanding BAN's and pay related expenses on the issue of the proposed bonds.  Petitioner represents that the proposed bonds will be long-term obligations but did not, in its ruling request or otherwise (until its original brief, see supra note 2), set forth any terms of payment of principal.  For purposes of its ruling request, petitioner represented that the proposed bonds would be long-term obligations, with a term of 25 years or less, and that the yield should be assumed to be 6 percent compounded semiannually.

Section 103(a) generally excludes interest on State and local government bonds from taxable income.  The exclusion is

---

The BAN's have been issued on the basis that the interest thereon was not excludable under sec. 103(a).  Petitioner has, however, sought to preserve the possible tax-exempt status of such interest by filing Internal Revenue Service Form 8038-G in respect of the 1994 and 1995 BAN's and Internal Revenue Service Form 8038-T, along with an arbitrage rebate payment in respect of the 1994 BAN's based on the differential between the 4.25-percent interest rate on the City obligation and the yield on such BAN's.

inapplicable to any arbitrage bond within the meaning of section 148.  Sec. 103(b).

An arbitrage bond is defined in section 148(a) as follows:

(a) Arbitrage Bond Defined.--For purposes of section 103, the term "arbitrage bond" means any bond issued as part of an issue any portion of the proceeds of which are reasonably expected (at the time of issuance of the bond) to be used directly or indirectly--

(1) to acquire higher yielding investments * * *

For purposes of this subsection, a bond shall be treated as an arbitrage bond if the issuer intentionally uses any portion of the proceeds of the issue of which such bond is a part in a manner described in paragraph (1) * * *.

A higher yielding investment is "any investment property which produces a yield over the term of the issue which is materially higher than the yield on the issue."  Sec. 148(b)(1).

Section 148(b)(2) provides in pertinent part:

(2)  Investment property.--The term "investment property" means--

(A)  any security (within the meaning of section 165(g)(2)(A) or (B)),

(B)  any obligation,

(C)  any annuity contract,

(D)  any investment-type property * * *

The legislative purpose in enacting these provisions is reflected in the following statement in the report of the House

Ways and Means Committee at the time section 148 was enacted in 1986:

> The bill also provides additional restrictions on the types of obligations in which bond proceeds may be invested without regard to yield restrictions.  Under the bill, the arbitrage restrictions are expanded to apply to the acquisition of any property held for investment other than another bond exempt from tax under the Code.  Thus, investment in any taxable security as well as any deferred payment contract (e.g., an annuity) or other property held for investment is precluded if the yield on the property is materially higher than the yield on the bonds.  This restriction applies regardless of the purpose of the investment (e.g., whether the investment is acquired as an acquired purpose obligation, an acquired nonpurpose obligation, or an acquired program obligation).  <u>Under this rule, for example, the purchase of an annuity contract to fund a pension plan of a qualified governmental unit would be subject to the same arbitrage restrictions as would direct funding of that plan with bond proceeds</u>.  The purchase of bond insurance is not considered to be the purchase of an annuity contract.  <u>Similarly, investment of bond proceeds in any other type of deferred payment investment-type contract to fund an obligation of the issuer or bond beneficiary would be subject to these yield restrictions</u>.  The restriction would not apply, however, to real or tangible personal property acquired with bond proceeds for reasons other than investment (e.g., courthouse facilities financed with bond proceeds).  [H. Rept. 99-426 (1985), 1986-3 C.B. (Vol. 2) 1, 552; fn. ref. omitted; emphasis added.]

Almost the same statement appears in the report of the Senate Finance Committee.  S. Rept. 99-313 (1985), 1986-3 C.B. (Vol. 3) 1, 845; see also H. Conf. Rept. 99-841 (1986), 1986-3 C.B. (Vol. 4) 1, 747.

Investment-type property is defined in section 1.148-1(b), Income Tax Regs., in pertinent part, as follows:

Investment-type property includes any property, other than property described in section 148(b)(2)(A), (B), (C), * * * that is held principally as a passive vehicle for the production of income.  Except as otherwise provided, a prepayment for property or services is investment-type property if a principal purpose for prepaying is to receive an investment return from the time the prepayment is made until the time payment otherwise would be made.  A prepayment is not investment-type property if--

(1)  The prepayment is made for a substantial business purpose other than investment return and the issuer has no commercially reasonable alternative to the prepayment, or

(2)  Prepayments on substantially the same terms are made by a substantial percentage of persons who are similarly situated to the issuer but who are not beneficiaries of tax-exempt financing.

The parties have presented us with a welter of arguments many of which are devoted to a semantical analysis of the foregoing statutory provision and of other provisions of the regulations under sections 148 and 150 dealing with the extent to which the regulations in respect of the refunding of prior issues apply to the proposed bond issue and the BAN's.  In particular, petitioner argues that the proposed bonds constitute a refunding issue of the BAN's and through them of the City Obligation and that the specific tracing methods of the regulations[4] preempt any prepayment analysis.  Respondent agrees that the proposed bonds are a refunding issue of the BAN's, so that we may treat the

See secs. 1.148-9, 1.150-1(d)(1), (5), Income Tax Regs.

proposed bonds as if the funds raised therefrom were utilized directly in 1994. As to petitioner's characterization of the City Obligation, petitioner fails to accord adequate recognition to the broad authority given to the Secretary to issue regulations implementing section 148. Thus, section 148(i) provides:

> (i) Regulations.--The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this section.

The breadth of this authority to issue "legislative" regulations, see Coca-Cola Co. & Subs. v. Commissioner, 106 T.C. 1, 18-19 (1996), is clearly revealed by the following statement in the report of the House Ways and Means Committee at the time of the enactment of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, sec. 1013(a)(34)(A), 102 Stat. 3342, 3544:

> The bill further deletes and re-inserts the term "necessary" in the specific regulatory authority granted the Treasury Department under the arbitrage restrictions. This amendment is intended to clarify that Treasury's regulatory authority is to be interpreted broadly, rather than in a literal, dictionary manner * * *. That regulatory authority is intended to permit Treasury to eliminate any devices designed to promote issuance of bonds either partially or wholly as investment conduits in violation of the provisions adopted by Congress to control such activities and to limit the issuance of tax-exempt bonds to amounts actually required to fund the activities for which their use specifically has been approved by Congress. Further, that regulatory authority is intended to permit Treasury to adopt rules (including allocation, accounting, and replacement

rules) necessary or appropriate to accomplish the purpose of the arbitrage restrictions, which is to eliminate significant arbitrage incentives to issue more bonds, to issue bonds earlier, or to leave bonds outstanding longer. [H. Rept. 100-795 at 327-328 (1988).]

In accordance with the authority, section 1.148-10(e), Income Tax Regs., provides:

(e) Authority of the Commissioner to clearly reflect the economic substance of a transaction. If an issuer enters into a transaction for a principal purpose of obtaining a material financial advantage based on the difference between tax-exempt and taxable interest rates in a manner that is inconsistent with the purposes of section 148, the Commissioner may exercise her discretion to depart from the rules of § 1.148-1 through § 1.148-11 as necessary to clearly reflect the economic substance of the transaction. For this purpose, the Commissioner may recompute yield on an issue or on investments, reallocate payments and receipts on investments, recompute the rebate amount on an issue, or otherwise adjust any item whatsoever bearing upon the investments and expenditures of gross proceeds of an issue.

Petitioner makes much of the fact that it is prepared to issue the proposed bonds on the basis of the interest thereon being taxable, i.e., not exempt under section 103(a). Such being the case, petitioner argues that the prepayment did not have "a principal purpose * * * to receive an investment return" within the meaning of section 1.148-1(b) or 1.148-10(e), Income Tax Regs. Consequently, petitioner asserts that the question of "yield" becomes irrelevant in determining whether the proposed bonds are arbitrage bonds. We disagree.

There is no question that petitioner's purpose in prepaying the City Obligation was to profit from the discount offered by the State Fund.[5]  The fact that it would profit from the discount if the interest on the proposed bonds were taxable does not negate the fact that such profit would be greater if such interest was exempt from tax under section 103(a).  Nor does the fact that the issuance of taxable bonds would also be advantageous turn the purpose of the proposed issue on a nontaxable basis from a principal to a subsidiary purpose.  Such a view would emasculate the arbitrage restrictions of section 148 whenever a financial advantage of a bond issue could be obtained whether the interest on the bonds was taxable or nontaxable.  In this connection, we think it significant that the regulation speaks in terms of "a" and not "the" principal purpose.  <u>Santa Fe Pacific v. Central States Pension Fund</u>, 22 F.3d 725, 727 (7th Cir. 1994).

---

In its application for the ruling, petitioner stated:

[O]ne of the principal governmental purposes for issuing the BANs, and for issuing the Proposed Bonds * * * was to achieve an economic benefit represented by a present value debt service savings with respect to the City Obligation.  That debt service savings was made possible in part because of the ability of the City to pay off the City Obligation at the amount provided for in the Payoff Agreement, i.e. 65% of the principal balance of the City's employer's accrued liability, plus accrued interest through January 31, 1994 at 4.25%.

Two key requirements for the application of the arbitrage provisions of section 148 are that there must be an acquisition of investment property, which produces a materially higher yield. Sec. 148(a) and (b), supra p. 10. We turn first to the question of whether the prepayment was used to acquire investment property. Petitioner argues initially that, at no time, was there any acquisition of investment property because, in 1967, there was simply an exchange of liabilities, i.e., the obligation of the City Fund for the obligation of the State Fund. This position is utterly without merit. The obligation of the State Fund was clearly property in the hands of the City and was a specific type of property that Congress had in mind, i.e., the equivalent of a funding of the pension obligation of the City. See supra p. 11.

Petitioner goes on to argue that, at the time of the prepayment in 1994, the City was doing nothing more than discharging the City Obligation and that one does not acquire property when it acquires its own indebtedness. Leaving aside the question whether the acquisition of one's own indebtedness constitutes the acquisition of "property", we think petitioner overstates the proposition in the context of the situation herein. The City Obligation represented the payment for the obligation of the State Fund in 1967, and we think that nexus remained extant at the time of the 1994 prepayment. In short,

the source to which the prepayment applied was the acquisition of the obligation of the State Fund and controls the character of the transaction.  Cf. Woodward v. Commissioner, 397 U.S. 572 (1970) (articulating the "origin of the claim" test).  Thus, we conclude that the prepayment was for property and consequently we turn to the question whether it was "investment property".  On this point, the parties have locked horns on whether the prepayment falls within the ambit of "investment-type property" within the meaning of section 1.148-1(b), Income Tax Regs., supra p. 12.

Petitioner argues that the prepayment is not investment-type property because it satisfies the latter of the two exceptions in the regulations, namely a prepayment is not investment-type property if prepayments on substantially the same terms are made by a substantial percentage of persons who are similarly situated but who are not beneficiaries of tax-exempt financing.  The regulation does not define a substantial percentage.

As of October 20, 1993, when the State Fund offered the discount for prepayment, there were 224 municipalities with obligations to the State Fund.  As of December 14, 1995, 36 municipalities had prepaid at the 35-percent discount.  It is represented that none of the 35 municipalities, excluding petitioner, utilized the benefit of tax-exempt financing with respect to their prepayments.  In sum, 36 of 224 municipalities,

or 16.07 percent, made a prepayment on substantially similar terms.

Petitioner cites various instances where the term "substantial" refers to percentages of 5 to 15 percent, including section 1.103-11(b), Income Tax Regs. (5 percent); section 1.148-2(e)(2)(B), Income Tax Regs. (5 percent); section 6662(d)(1) (10 percent); and section 147(c)(2)(E) (15 percent). Elsewhere, the term refers to percentages as high as 25 percent, section 42(d)(2)(D)(i)(III); section 6229(c)(2), and 33 percent, section 382(l)(4)(B)(i).

Clearly, the term "substantial" can cover a wide range of values.[6] Where Congress meant only to allow customary prepayments, we do not find that 16.07 percent is a substantial percentage. Thus, the prepayment herein does not satisfy the exception, and the prepayment of the City Obligation with the proceeds of the BAN's constitutes the acquisition of investment-type property. Moreover, we are not convinced that Congress intended that the exception should apply where, as is the case herein, the only offerees of the prepayment opportunity were entities who were beneficiaries of tax-exempt financing rather than to a class of offerees that included some of these beneficiaries. If this were the standard for the application of

_____

See Nabisco Brands, Inc. v. Commissioner, T.C. Memo. 1995-127 at n.22.

the exception, the number of persons who took advantage of the prepayment terms would appear to be irrelevant.

Having decided that petitioner is not entitled to the benefits of the exception in section 1.148-1(b), Income Tax Regs.,[7] we are left with the issue whether the prepayment produced a materially higher yield than the proposed bonds.  Sec. 148(b)(1).

Respondent argues that, by virtue of the discount arrangement with the State Fund, the City should be treated as sharing in the investment yield of that fund, the rate of yield being 8.25 percent.  Petitioner argues that the City and the State Fund are separate entities and that such "sharing" implies a partnership or combined entity which has no legal justification.  We agree with petitioner on this point.  There is no doubt that the high rate of yield anticipated by the State Fund was the foundation of the discount arrangement and no doubt entered into the determination of the amount of the discount which the State Fund decided to offer.  But it does not follow that this circumstance justifies the conclusion that the City had an ongoing share in the investment yield of the State Fund.  Our

No inference should be drawn that we would have ruled in favor of petitioner if the exception did apply.  Under such circumstances, we would still have to decide whether respondent should still prevail because of the broad discretionary authority conferred upon her by sec. 1.148-10(e), Income Tax Regs., supra p. 14.

rejection of respondent's yield argument does not, however, end our inquiry.

Petitioner concedes that, if the discount is taken into account, the yield is 7.57484 percent, which is more than sufficient to constitute a materially higher yield than the 6 percent yield on the proposed bonds.[8] Petitioner contends, however, that the discount should not be taken into account and that the proper yield for purposes of comparison is the 4.25-percent interest rate on the City Obligation. We disagree. If the discount is not taken into account, one is faced with a most peculiar situation, namely, a borrowing at 6-percent interest to pay off an obligation bearing 4.25-percent interest. It is only because of the discount that the prepayment and the financing thereof at a 6-percent interest rate make any sense. Indeed, that is the clear foundation of the transactions and the substantive justification for the prepayment.

In sum, we hold that, however one views the transactions involved herein, a principal purpose of the City was to replace the City Obligation with a payment for an investment in the State

---

A materially higher yield, with exceptions not applicable herein, is a yield one-eighth of 1 percentage point greater than that of the issue in question. Sec. 1.148-2(d)(2), Income Tax Regs.; Staff of the Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 1201-1202 (J. Comm. Print 1987).

Fund's obligation to finance the City's original unfunded pension obligations in a manner which produces the equivalent of a 7.57484-percent return, i.e., yield, on such investment. Under the circumstances herein, irrespective of the technicalities of the arbitrage regulations under section 148, respondent was entitled to make the adjustment of the yield calculation to take the 35-percent discount into account and to reject petitioner's application for ruling under section 1.148-10(e), Income Tax Regs., on the ground that the economic substance of the transaction clearly revealed a materially higher yield within the meaning of section 148(a) and (b) and the regulations thereunder. Consequently, the interest on the proposed bonds will not be exempt under section 103(a).

In view of the foregoing, we find it unnecessary to consider the other arguments of the parties.

<u>Decision will be entered</u>

<u>for respondent</u>.