**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, et al., Plaintiffs and Counter-defendants,**

v.

**HUNT TRUCK LINES, INC., Defendant and Counterplaintiff.**

No. 98–C–6464.

United States District Court, N.D. Illinois, Eastern Division.

April 8, 1999.

Jon K. Stromstat, Des Plaines, IL, for plaintiff.

Hervey H. Aitken, Jr., Roy A. Sheetz, Taylor, Thiemann & Aitken, L.C., Alexandria, VA, Mark A. Spognardi, Jr., McBride, Baker & Coles, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Central States, Southeast and Southwest Areas Pension Fund and its Trustee (collectively "Fund," treated as a singular noun [1]) seeks enforcement of an arbitration award (the "Award") against Hunt Truck Lines, Inc. ("Hunt") regarding Fund's claim against Hunt for secondary withdrawal liability under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1371, as amended by the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §§ 1381–1461.[2] For its part, Hunt seeks to vacate or modify the Award. Each party also asks this Court, should it prevail, to grant it the recovery of attorneys' fees and expenses related to this action.

Each of Fund and Hunt now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Fund's summary judgment motion is granted and Hunt's motion is denied. This Court orders enforcement of the Award, leaving the attorneys' fees and expenses issue for resolution in accordance with this District Court's General Rules ("GR") 46 and 47.

### Legal Standards

■ This Court's authority "to enforce, vacate, or modify the arbitrator's

---

1. Because Fund is a frequent litigant in the federal courts, and to avoid cumbersome repetition, citations to others of its cases in this opinion will refer to it simply as "Central States Fund" rather than spelling out its full name.

2. All ERISA and MPPAA provisions will be cited simply "Section—," referring to their Title 29 numbering rather than to ERISA's or MPPAA's internal numbering.

award" under MPPAA derives from Section 1401(b)(2). Findings of fact made by the arbitrator are presumed correct, rebuttable only by a clear preponderance of the evidence (Section 1401(c)), and mixed questions of law and fact are reviewed for clear error (*Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1411 (7th Cir. 1989)). Although an arbitrator's conclusions of law are subject to de novo review (*Central States Fund v. Bell Transit Co.*, 22 F.3d 706, 710 (7th Cir.1994)), "every time a court substitutes its judgment for that of the arbitrator, the benefit of proficiency is lost and disposition becomes more sluggish" (*Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan*, 3 F.3d 994, 1000 (7th Cir.1993), *aff'd on other grounds,* 513 U.S. 414, 115 S.Ct. 981, 130 L.Ed.2d 932 (1995)).[3]

Summary judgment is in order "when no genuine issues of material fact exist and when the moving party is entitled to judgment as a matter of law" (*Bell Transit,* 22 F.3d at 710). On each side's current motion this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir. 1991) and cases cited there). Because both Hunt and Fund have moved for summary judgment, it is necessary to adopt a dual perspective that sometimes involves the denial of both motions. But because the material facts here are not in dispute, no such hazard is posed.

### Statutory Background

As first enacted in 1974, ERISA created the Pension Benefit Guaranty Corporation ("PBGC") to administer and enforce a pension plan termination insurance program under which employers were required to pay insurance premiums (*Concrete Pipe &*

*Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 607, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993)). Under those original terms, the guaranty of basic benefits by multiemployer plans in the event of termination was not mandated to take effect until 1978 (*id.* at 607–08, 113 S.Ct. 2264). As the date for mandatory coverage approached, Congress recognized that employers might withdraw from weak plans to escape liability (*id.* at 608, 113 S.Ct. 2264). Fearing that the insurance system as originally conceived might be jeopardized by such an exodus, Congress postponed the mandatory guaranty date and requested that PBGC analyze the potential threat to multiemployer plans and suggest solutions (*id.*).

In 1980 Congress enacted MPPAA in response to the advice it received from the PBGC (*id.* at 609, 113 S.Ct. 2264). MPPAA's purpose was to hold employers accountable for their vested pension fund liabilities upon their withdrawal from multiemployer plans to avoid shifting the burden to other employers (which might perhaps lead to the domino effect of other employers following suit) (*Bell Transit,* 22 F.3d at 707). Hence an employer that withdraws from a multiemployer pension plan is now held responsible for "a sum approximating the vested but unfunded benefits of the employer's employees" (*Santa Fe Pac. Corp. v. Central States Fund,* 22 F.3d 725, 726 (7th Cir.1994)). Technically MPPAA charges the employer with the difference between the present value of vested benefits and the current value of the plan's assets (*Concrete Pipe,* 508 U.S. at 609, 113 S.Ct. 2264). That "withdrawal liability" not only protects other employers in the plan from having to pay for those benefits (*Santa Fe,* 22 F.3d at 727) but also operates to avoid the ultimate shifting of such costs to PBGC as the insurer under the plan (*Bell Transit,* 22 F.3d at 707).

---

**3.** Thus *Jos. Schlitz Brewing,* 3 F.3d at 1000 held that when a court is reviewing an arbitrator's document construction (which is not

the situation here) it should ask only "whether the arbitrator adopted a reasoned interpretation of the documents."

To collect withdrawal liability, a plan first calculates the amount owed by a withdrawing employer (Sections 1382 and 1391) then notifies the employer of the amount due (Section 1399(b)(1)). Any employer that wishes to challenge the assessment of liability may submit a request to the plan for review (Section 1399(b)(2)) and may initiate arbitration if dissatisfied with the results (Section 1401(a)(1)). Throughout the proceedings, however, the plan's determination of liability "is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous" (Section 1401(a)(3)(A)). After arbitration a party may bring an action to enforce, vacate or modify the award (Section 1401(b)(2)). Generally ERISA and MPPAA establish a "pay first, arbitrate after" system: While proceedings are pending, Sections 1399(c)(2) and 1401(a) require the employer to make interim withdrawal liability payments until a final determination is made, at which point any payment is recouped if the employer has won (*Central States Fund v. Lady Baltimore Foods, Inc.*, 960 F.2d 1339, 1341 (7th Cir.1992)).

### Facts

Fund is an ERISA multiemployer pension plan to which Hunt had a contribution obligation on behalf of some of its employees, as provided in various collective bargaining and participation agreements (Jt.Stmt.¶¶ 1–2). That obligation ended on May 28, 1994, when Hunt sold its assets to Wintz Parcel Drivers, Inc. ("Wintz") (*id.* ¶ 3). In late June 1995 Fund determined that the sale of Hunt's assets to Wintz triggered the requirements of Section 1384 (id.¶ 4). Under that provision Hunt faced the earlier-described withdrawal liability only if certain conditions were not met, such as Wintz' non-withdrawal from Fund's plan during the next five plan years (*id.*).

Fund later determined that Wintz withdrew completely in early May 1996. Accordingly it sent Hunt a May 31, 1996 notice and demand for payment of secondary withdrawal liability because Wintz had not stayed with Fund for the statutorily required five years (*id.* ¶ 8). Fund also notified Wintz (1) of its obligation to make withdrawal payments in a June 14, 1996 letter and (2) of its past-due liability in a letter received by Wintz on August 26, 1996 (*id.* ¶¶ 7, 11). Wintz is currently contesting that assessment in both arbitral and judicial proceedings.

In the meantime Hunt refused to pay the withdrawal liability assessed against it, and in December 1996 Hunt requested arbitration in accordance with Section 1401 (*id.* ¶ 18). Arbitrator Ira Jaffe (sometimes referred to here simply as "the Arbitrator") presided over the arbitration proceedings, which Hunt described as posing these issues (see its GR 12(M) Statement Ex.3):

1) Can a plan issue a notice and demand for withdrawal liability before there is a withdrawal?

2) Can a plan first demand withdrawal liability against a secondarily-liable employer under ERISA Section 4204 before the liability of the primarily-liable purchaser is paid?

It is apparent from a mere reading of that second issue that it needs recasting, and the Award did indeed reframe it as inquiring whether a plan can first demand withdrawal liability against the secondarily liable seller under Section 1384 before the liability of the primarily liable purchaser is *definitively established*. This opinion will follow that more accurate characterization.

In June 1998 Arbitrator Jaffe issued his Award, in which he found that Fund had issued its notice and demand against Hunt prematurely (*id.* ¶ 26). That was based on his determination that while Fund did not have to wait to assess secondary liability against Hunt until after the Wintz proceedings were fully completed, it did have to wait until Wintz had failed to make at least one payment when due. To conform to that determination, Arbitrator Jaffe di-

rected Fund to issue a revised demand for withdrawal liability and a revised payment schedule with a first payment date of November 1, 1996—four months later than the first payment date in Fund's initial demand (*id.*).

Later the parties stipulated that Wintz had completely withdrawn from Fund on July 27, 1996 (*id.* ¶ 25). Arbitrator Jaffe approved that stipulation and the Award became final (*id.* ¶ 28). Fund issued the revised demand and payment schedule as the Arbitrator had required (*id.* ¶ 27).

At this point Hunt has made no interim payments to Fund. In September 1996 Fund had filed a separate suit seeking interim withdrawal liability payments (*id.* ¶ 14), as typically required in ERISA's "pay now, dispute later" system. This Court's colleague Honorable John Nordberg, to whom that case was assigned, held that Hunt did not have to make interim payments because Fund's premature notice had not technically complied with ERISA's procedural requirements (see *Central States Fund v. Hunt Truck Lines, Inc.,* No. 96 C 5634 (N.D.Ill. Jan. 12, 1999), attached in full to P. Mem.).

### Review of the Award

This opinion begins its review of the Award by examining the Arbitrator's resolution of the two questions identified in the preceding section. It then proceeds to determine the Award's enforceability in those terms.

■ Arbitrator Jaffe answered the first question (whether a pension plan can issue a notice and demand for withdrawal liability before there is a withdrawal) in the negative. Indeed, both parties now agree that Fund issued its initial notice and demand to Hunt prematurely.

■ As to the second question in its recast form (whether Plan can first demand withdrawal liability against secondarily liable seller Hunt under Section 1384 before the liability of primarily liable purchaser Wintz is definitively established), Arbitrator Jaffe determined that while a plan must wait to assess secondary liability until the primarily liable employer fails to make at least one payment, under Section 1384 it does *not* have to wait until after the issue of the primarily liable employer's withdrawal has been resolved with finality through arbitral and judicial proceedings.[4] That reading of the statute comports both with its language and with common sense.

Section 1384(a)(2) reads:

If the purchaser—

(A) withdraws before the last day of the fifth plan year beginning after the sale, and

(B) fails to make any withdrawal liability payment when due,

then the seller shall pay to the plan an amount equal to the payment that would have been due from the seller but for this section.

That language includes no exhaustion-like requirement directing a plan to attempt to recover the missed withdrawal liability from the purchaser before assessing such liability against the seller. To the contrary, the statute describes exactly what happened here: Purchaser Wintz withdrew before five plan years were over and then failed to make a withdrawal liability payment when due, and Fund assessed the secondary liability against seller Hunt that Hunt would have had to pay had it not come within Section 1384's safe harbor in the first place.[5]

This Court therefore finds that Arbitrator Jaffe correctly answered both questions submitted to him by the parties. But

4. Hunt's repeated insistence that Arbitrator Jaffe answered the second question in the negative is simply incorrect. His answer did not involve a simple "yes" or "no," but rather engaged in the more complex analysis just described.

5. Admittedly Fund pulled the trigger too early, but that is not relevant to whether Fund must exhaust its efforts against Wintz before assessing liability against Hunt.

Hunt's central challenge is to the relief provided by the Arbitrator. Hunt argues that Arbitrator Jaffe's remedy not only exceeded the scope of his authority but also violated ERISA's withdrawal liability provisions. This Court disagrees and orders enforcement of the Award.

■ Arbitrator Jaffe acted fully within his arbitral authority when, instead of voiding the assessment completely, he directed Fund to issue a revised demand and payment schedule to Hunt. Hunt contends that fashioning such a remedy was not within the Arbitrator's power because the parties had submitted only two questions to Arbitrator Jaffe and neither question addressed a remedy. That contention glosses over (or ignores entirely) the fact that both parties' briefs before the Arbitrator expressly urged appropriate *relief,* depending on the Arbitrator's answers to the two submitted questions. Hunt cannot now argue that just because Arbitrator Jaffe did not provide the relief Hunt sought, he did not have the authority to fashion any remedy at all.

Hunt further urges that the Award did not comport with ERISA itself—specifically, Sections 1382 and 1399(c)(2) and (5). Hunt reads those provisions hypertechnically, claiming that because Fund issued its initial notice and demand too early—before Wintz failed to make a payment when due—it violated ERISA's timing provisions, so that Fund cannot now recover the secondary liability that everyone acknowledges Hunt would have owed had the notice and demand not been issued prematurely. That argument fails for two reasons.

First, Arbitrator Jaffe had the statutory authority to make adjustments to the demand and payment schedule. Section 1401(d) states in relevant part:

Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination.

Here Hunt has made no interim withdrawal liability payments at all, so that Arbitrator Jaffe appropriately made the subsequent "necessary adjustment[ ]" by ordering Fund to revise the payment schedule according to what Hunt would have owed had the notice and demand been issued at the right time. Nothing within ERISA or MPPAA requires the complete voiding of Fund's assessment against Hunt because of a timing mistake (see *Marvin Hayes Lines, Inc. v. Central States Fund,* 814 F.2d 297, 300 (6th Cir. 1987)).

Arbitrator Jaffe sensibly did not nullify the entire notice and demand process, instead simply ordering a revision to reflect the correct dates of Wintz' withdrawal and default and Hunt's subsequent liability. That revision will result in the accurate collection of withdrawal liability, which is MPPAA's ultimate policy goal (*Masters, Mates & Pilots Pension Plan v. USX Corp.,* 900 F.2d 727, 735–36 (4th Cir.1990)). So long as there is no prejudice to the employer and no bad faith on the part of the Fund (*id.* at 736), this Court sees no reason to vacate Arbitrator Jaffe's relief determination.

Hunt argues that it has somehow been prejudiced by Fund's error because it now must pay the interest that has accrued on its withdrawal liability. Quite apart from the fact that Hunt will pay four months' less interest with the revised payment schedule, it had to know when it declined to make interim payments that it might ultimately lose on the merits and be required to pay its liability with interest.[6]

---

6. Judge Nordberg's January 1999 opinion held that Hunt was not required to pay interim withdrawal liability payments while the arbitration was pending because Fund had issued its notice and demand too soon. That somewhat novel decision not to hold Hunt to

Its contention is really bizarre, coming as it does from a business that must understand the nature of interest as the price paid for the use of money—in this instance Hunt has had the use of the money during the period for which it now must pay interest, so that excusing it from such interest payments would confer an undeserved windfall.

Second, the Award does not violate ERISA's provisions governing the assessment and collection of withdrawal liability. Hunt attempts to rely—in an overly formalistic argument—on the sequence of events prescribed by Sections 1382 and 1399(c). Section 1382 sets out the steps a multiemployer plan should take when an employer withdraws from the plan,[7] and Section 1399(c)(2) establishes the number of days the employer has to make its first withdrawal liability payment after receiving the plan's demand. Hunt says that Fund violated those sections because it issued the initial notice and demand before any withdrawal occurred. But that error is precisely what the Arbitrator addressed in the Award. Arbitrator Jaffe ordered that the notice be revised to demand payment for only the time period following Wintz' withdrawal and its subsequent default on its withdrawal liability.

Nothing about the Award in those terms violates Sections 1382 or 1399(c)(2). Nor, for that matter, does it violate Section 1399(c)(5). That provision allows a plan to accelerate withdrawal liability payments, requiring the employer to pay the full outstanding amount with interest if an employer does not make one of its payments on time. It also provides the employer with 60 days to cure that untimeliness before such acceleration occurs. Here Fund did not argue that Hunt should be immediately liable for the entire withdrawal amount.[8] Furthermore, because the revised payment schedule ends in May 1999 in all events (H.Ex.5), as a practical matter Hunt will have to pay the entire withdrawal liability at once. Hence the right to cure that Hunt claims it is losing is simply not an issue.

This Court is not going to invoke a "punishment theory" for a plan's simple timing error (*Marvin Hayes Lines*, 814 F.2d at 300–01). Arbitrator Jaffe, "who understands the problems and solutions of the trade" (*Jos. Schlitz Brewing*, 3 F.3d at 1000), fashioned a sensible remedy to cure the timing problem that occurred in this case—a remedy that violates neither ERISA nor MPPAA.

*Conclusion*

There is of course no genuine issue of material fact, for the cross-motions under Rule 56 present only questions of law. Fund is entitled to a judgment as a matter of law, so that its motion for summary judgment is granted, while Hunt's summary judgment motion is of course denied. This Court orders Hunt to comply with the Award. As for the subject of attorneys' fees and expenses, which the litigants sought in their pleadings but did not address in their Rule 56 motions, GR 46 and 47 establish the timetable and procedures for addressing that subject (without affecting the finality of this ruling—see *Budinich v. Becton Dickinson & Co.*, 486 U.S.

---

ERISA's statutorily prescribed "pay now, dispute later" procedure need not impact this review of the Award. That opinion addressed only interim withdrawal liability and did not review Arbitrator Jaffe's decision dealing with Hunt's ultimate withdrawal liability. In any event this Court need not adhere to that earlier decision: In addressing the law of the case doctrine, our Court of Appeals teaches that one district court judge is not necessarily held to the decision of another (*Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir.1995)).

**7.** Those steps comprise (1) the employer's withdrawal, (2) the plan's determination of the amount of withdrawal liability, (3) the notification to the employer of that amount and (4) collection from the employer.

**8.** When Fund sent Hunt the revised payment schedule in July 1998, it requested immediate payment only of the payments due at that point (H.Ex.5).

196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988)).